# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

UP TO $4,270.11 IN FUNDS ON DEPOSIT IN
U.S. BANK ACCOUNT ENDING IN 2286 HELD
IN THE NAME OF OTIS D. WRIGHT

Case Number: 17-907 M (NJ)

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Brian K. Due, being duly sworn depose and say:

I am a Special Agent with the Federal Bureau of Investigation and have reason to believe that in the Eastern District of Wisconsin there is now certain property, namely, up to $4,270.11 in funds on deposit in U.S. Bank account ending in 2286 held in the name of Otis D. Wright, that is civilly forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984, including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and criminally forfeitable under 18 U.S.C. § 981(a)(1)(C) in conjunction with 28 U.S.C. § 2461(c), as property that is derived from proceeds traceable to specified unlawful activity, namely, interstate transportation of stolen property in violation of 18 U.S.C. § 2314, and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b)(2) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

✓ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Sworn to before me, and subscribed in my presence

*[signature]*
Signature of Affiant
Brian K. Due, FBI

*July 17, 2017*
Date and time issued

at Milwaukee, Wisconsin
City and State

*[signature]*
Signature of Judicial Officer

NANCY JOSEPH, U.S. Magistrate Judge
Name & Title of Judicial Officer

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT

I, Brian K. Due, having been duly sworn on oath, state as follows:

## Affiant's Background

1. I am employed as a Special Agent with the Federal Bureau of Investigation ("FBI") of the United States Department of Justice, and have been so employed for the past 29 years. I am currently assigned to the Milwaukee Division's White Collar Crime squad. My duties as a Special Agent include investigating violations of federal law, including various white-collar crimes such as wire fraud, bank fraud, mortgage fraud, and money laundering. I have received training regarding investigating white-collar crimes, have participated in numerous investigations of white-collar crimes, and have served as the affiant for numerous search, arrest, and seizure warrants.

2. Because I am submitting this affidavit for the limited purpose of establishing probable cause for the requested seizure warrant, I have not included in this affidavit every detail I know about this investigation. Rather, I have included only the information necessary to establish probable cause for the requested seizure warrant.

3. The facts set forth in this affidavit are based on my personal knowledge, including what I have learned through my training and experience as a law enforcement officer, my review of documents and other records obtained in the course of this investigation, and information I have obtained in the course of this investigation from witnesses having personal knowledge of the events and circumstances described herein and other law enforcement officers, all of whom I believe to be truthful and reliable.

4. Where appropriate, I have used the initials of witnesses, or unrelated third parties, in order to preserve their anonymity. Similarly, I have redacted a portion of each referenced bank account number in order to avoid the unnecessary release of private banking information.

## Property Sought to be Seized

5. I submit this affidavit in support of an application for a warrant to seize up to $4,270.11 on deposit in U.S. Bank account ending in 2286 ("USB 2286"), held in the name of Otis D. Wright.

6. Based on the facts and circumstances set forth below, I submit that there exists probable cause to believe that up to $4,270.11 on deposit in USB 2286 are:

   a. Funds traceable to, and are therefore proceeds of, the offense of interstate transportation of stolen property committed in violation of 18 U.S.C. § 2314;

   b. Subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(C) and 984, including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1);

c.  Subject to criminal forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); and

d.  Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

## Background

7.  On January 10, 2017, I interviewed an 80-year-old female having the initials "P.K.," who resides in Elkhorn, Wisconsin. P.K. stated she believed that she and her husband, who is 87 years of age, were the victims of a fraud scheme that had been perpetrated by multiple individuals. P.K.'s daughter, "M.K.," was present during the interview and had assisted P.K. in filing a fraud complaint with federal law enforcement authorities.

8.  According to P.K. and M.K., for more than two years numerous individuals had been contacting P.K. and her husband, both telephonically and via email, to inform P.K. and her husband that they had won large lottery prizes. The perpetrators told P.K. and her husband that in order to claim their winnings, P.K. and her husband needed to first send money to the perpetrators to pay for taxes and fees associated with the lottery winnings.

9.  For instance, on one occasion, P.K. and her husband received a letter dated June 9, 2015, which appeared to be printed on www.irs.gov letterhead and contained numerous spelling and grammatical errors. The letter informed P.K. that she had won $143,000,000 and that her prize was being held by the U.S. Customs Service because she needed to pay $83,940 in taxes before the prize could be claimed.

10. In a second instance, P.K. received a letter dated September 18, 2015, which appeared to be printed on MegaMillions letterhead and was purportedly sent by "Mega Millions Sweepstakes/Publisher Clearance House Company Ltd." The letter informed P.K. that she and her husband had won $143,000,000 along with three cars of their choosing.

11. In a third instance, P.K. received a letter dated October 26, 2015, which again appeared to be printed on www.irs.gov letterhead. The letter provided instructions to P.K. and her husband on where to forward a briefcase they had received, which they were unable to open. P.K. and her husband had been told that the briefcase contained $100,000,000 in lottery winnings. The letter informed P.K. and her husband that the security code on the briefcase needed to be reset, and that any attempts to tamper with it would result in exploding ink that would not be removable. P.K. and her husband complied with the letter's instructions to have the briefcase sent to an Oregon resident. (Public databases indicate that Oregon resident is 75 years of age.) The letter also stated that P.K. and her husband's $100 million prize and automobiles could be picked up at the U.S. Customs Department in Green Bay, Wisconsin, and it provided the name of a "Chief Executive Officer" who was holding their winnings.

2

12. Despite numerous other notifications, that P.K. and her husband had received indicating they were winners of lottery prizes and luxury vehicles valued at $1,000,000 or more, P.K. and her husband have never received any money or merchandise.

13. But P.K. and her husband were duped into sending money to at least 16 different individuals as a result of the scheme. They sent that money via cashier's checks, checks from their checking accounts, money orders, MoneyGrams, credit card expenditures, loans they took out at the perpetrators' requests, and deposits they made, as the perpetrators directed, into the perpetrators' accounts.

14. To fund these payments, P.K. and her husband have sold a number of their possessions and provided the sales proceeds to the perpetrators, and they have cashed out life insurance policies at the perpetrators' direction. P.K. and her husband have currently sent an estimated more than $700,000 to the perpetrators.

15. Through its investigation, FBI has determined that most of the perpetrators involved in the scheme appear to reside in Jamaica and that a few appear to reside in the United States.

**Facts Supporting Finding of Probable Cause for Issuance of Seizure Warrant**

16. In June 2017, I learned from M.K. (P.K.'s daughter) that P.K. had sold two personal automobiles, apparently at the direction of one of the perpetrators. One of the automobiles was sold for cash and the other was sold to a car dealership in Delavan, Wisconsin. The car dealership provided me with a copy of the $11,500 check that was provided to P.K. pursuant to the sale. The check, dated June 1, 2017, was made payable to P.K. P.K. had endorsed the back of the check as follows: "Payable to Otis Wright." Additional investigation determined that the check had been deposited into a U.S. Bank account belonging to Otis D. Wright – namely, USB 2286, the account from which the funds are sought to be seized. Wright's address was listed as Chicago, Illinois.

17. I determined that a second check, in the amount of $7,133.43 from Farmers Insurance, had been deposited into Otis Wright's USB 2286 on June 29, 2017. I spoke with M.K., who stated that P.K. and/or P.K.'s husband had liquidated a Farmers Insurance life insurance policy during June 2017.

18. Although M.K. and M.K.'s brother hold a secondary and primary Power of Attorney, respectively, for their parents' financial affairs, M.K. stated that their parents are still occasionally able to execute financial transactions without their children's knowledge. As an example, M.K. stated that as a result of M.K.'s and her siblings' fears that their parents would sell their cars and other assets in order to send more money to the perpetrators, the children arranged to require M.K.'s brother's signature on the vehicles' titles before the vehicles could be sold by P.K. and P.K.'s husband. M.K. subsequently learned that P.K. or P.K.'s husband had forged their son's signature in order to sell the vehicles.

19. Although P.K. and her husband have openly acknowledged to me that they have been victimized numerous times by the perpetrators of the fraud schemes, and although they

3

have been warned not to communicate with the perpetrators on numerous occasions – by their relatives, by bank employees, and by various law enforcement agencies – P.K. and her husband continue to communicate with the perpetrators, and are known to have sent money to the perpetrators on several occasions since they first met with me. As a result, due to the perception that P.K. and her husband appear to be making irrational decisions, and due to false information they have provided to me in the past, the information contained in this affidavit is primarily based upon statements provided to me by M.K., M.K.'s siblings, and M.K.'s nephew, and upon financial documentation I have reviewed relating to funds that P.K. and P.K.'s husband sent to the perpetrators.

20. On July 11, 2017, I spoke with a person purporting to be "Otis D. Wright" telephonically, in a call that was recorded via consensual monitoring. The phone number I used to reach Otis Wright was one Mr. Wright had provided to a US Bank customer service representative after Mr. Wright learned that the funds in his U.S. Bank account, USB 2286, had been frozen by the bank. I posed as a U.S. Bank employee while making the call to Mr. Wright. During the phone call, Mr. Wright initially stated that P.K. had deposited funds into USB 2286 near the beginning of June 2017 because P.K. was purchasing a car from him. Mr. Wright stated that P.K. then decided to cancel the purchase, so he withdrew the money in cash from his account and gave it back to P.K.

21. When I asked Mr. Wright about the second check, which was deposited on June 29, 2017, into USB 2286 and which had also been made payable to P.K., Mr. Wright explained that after the original vehicle purchase was canceled, P.K. again decided to purchase a vehicle through him. Mr. Wright then stated that the vehicle was being purchased by P.K.'s nephew, whom Wright had met in Jamaica, and that P.K. was paying for the vehicle on her nephew's behalf. When the vehicle purchase was canceled, Mr. Wright stated that he had refunded the money to P.K.'s nephew via a series of cash withdrawals that Wright made in Jamaica. According to Mr. Wright, the vehicle being purchased by P.K.'s nephew was a Toyota Premio. The proceeds of the second check were used to purchase the vehicle, which is being shipped from Japan. Wright stated it would take two months for the vehicle to arrive in Jamaica. When asked for the name of P.K.'s nephew, Mr. Wright replied, "It was, ummm, his name was, ummm, Otis. Not Otis – sorry. I don't remember the last name, but his first name... was Jason."

22. On July 13, 2017, I spoke with M.K., who informed me that P.K. and P.K.'s husband do not have any nephews, but do have a grandson named Jason.

23. On July 13, 2017, I also spoke with P.K.'s grandson, Jason, telephonically. Jason informed me that he has never been to Jamaica, is not currently in the process of purchasing an automobile, and has never spoken to P.K. or P.K.'s husband about purchasing an automobile.

24. On July 13, 2017, I also spoke with P.K. P.K. recalled depositing the two checks into Otis Wright's U.S. Bank account during June 2017. P.K. stated that she was instructed to make those deposits by a person whose name she cannot currently recall. P.K. had been told that Wright's account was a U.S. Government account, and that the deposits would cover taxes that P.K. owed for lottery winnings. P.K. was very upset when I informed her that she did not

4

deposit the funds into a U.S. Government account. P.K. stated that she never agreed to purchase an automobile for her grandson, or for any other family members.

## Applicable Asset Forfeiture Provisions

25. Under 18 U.S.C. § 984, a court may order the forfeiture of funds in a bank account into which monies subject to forfeiture have been deposited, without the need to trace the funds currently in the account to the specific deposits that are subject to forfeiture, up to the amount of the funds subject to forfeiture that have been deposited into the account within the past one-year period.

26. Section 984(a) provides in part:

> (1) In any forfeiture action in rem in which the subject property is cash [or] funds deposited in an account in a financial institution
>
> > (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
> >
> > (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.
>
> (2) Except as provided in subsection (c), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

27. 18 U.S.C. § 984(b) provides: "No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense."

28. Thus, under Section 984, a court may order the civil forfeiture of monies found in a bank account into which deposits of criminal proceeds subject to forfeiture had been made, up to the amount of the forfeitable deposits that have been made into the account within the prior one-year period, without the need for tracing the funds to be forfeited to any of the specific forfeitable deposits.

29. I submit that a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the funds for forfeiture because I have been advised of cases in which, even after a restraining order or similar process has been issued to a financial institution, the funds sought to be restrained were not effectively restrained by the financial institution. In my judgment, a seizure warrant would be the most effective way to assure the availability of the monies sought to be seized for forfeiture by the accompanying seizure warrant.

5

## Conclusion

30. Based on the facts and circumstances set forth in this affidavit, I submit that there exists probable cause to believe that up to $4,270.11 on deposit in USB 2286 are:

    a. Funds traceable to, and are therefore proceeds of, an interstate transportation of stolen property offense or offenses, committed in violation of 18 U.S.C. § 2314;

    b. Subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(C) and 984, including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1);

    c. Subject to criminal forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); and

    d. Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

### # # #